## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| CORTEZ FIELDS,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>UNITED NETWORK FOR ORGAN SHARING; FLORIDA HEALTH SCIENCES CENTER, INC., D/B/A TAMPA GENERAL HOSPITAL; ADVENTIST HEALTH SYSTEM SUNBELT HEALTHCARE CORPORATION, D/B/A ADVENTHEALTH; ADVENTIST HEALTH SYSTEM/SUNBELT, INC.,<br><br>　　　　　Defendants. | Case No.<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Cortez Fields ("Mr. Fields") brings this Complaint against the United Network for Organ Sharing ("UNOS"); Florida Health Sciences Center, Inc., d/b/a Tampa General Hospital ("Tampa General"); Adventist Health System Sunbelt Healthcare Corporation, d/b/a AdventHealth ("AdventHealth"); and Adventist Health System/Sunbelt, Inc. ("AdventHealth") (collectively "Defendants") (Tampa General and AdventHealth are collectively the "Hospital Defendants"), and alleges as follows:

1

## **INTRODUCTION**

1.     For more than two decades, UNOS and its affiliated transplant hospitals used what is known as the race-based coefficient to artificially increase the observed kidney function (eGFR) scores for Black kidney disease patients. The race-based coefficient delayed Black kidney disease patients from being added to the kidney transplant waitlist and resulted in Black candidates waiting much longer for kidney transplants than similarly-situated non-Black candidates.

2.     Use of the race-based coefficient was not the result of any valid scientific or peer-reviewed studies. Instead, developers of the race-based coefficient postulated that Black Americans showed increased levels of creatinine extraction because they have greater muscle mass than non-Black Americans; i.e., they relied solely on a defunct, eugenics-style racial stereotype.

3.     Making medical policy based on racial stereotypes harmed all Black Americans waiting to receive a donor kidney. This lawsuit focuses on Mr. Cortez Fields.

4.     Mr. Fields worked as a manager at the Walt Disney Company in diversity planning and development and eventually earned a six-figure salary. He takes great pride in his years of hard work and career.

5.      Mr. Fields was diagnosed with kidney disease many years ago. As a result of his disease and its complications, he was eventually unable to continue to advance his career.

6.      Mr. Fields's kidney disease worsened to the point where, in July of 2022, he began dialysis. Dialysis is a treatment that removes waste and extra fluids from the blood when kidneys can longer do the job.

7.      Dialysis made it very challenging to maintain a normal life. Mr. Fields was on dialysis four times a week, for approximately five hours each time. He had to be awake during dialysis and therefore the treatment occurred during the day. Mr. Fields's wife helped him with the dialysis. Since Mr. Fields was dependent on his wife to help with dialysis, and because dialysis took up a large portion of his day, this placed a great strain on his family. He was no longer able to travel and was forced to structure his days around his dialysis treatments. Being forced to do dialysis four times per week, for approximately five hours each time, caused Mr. Fields to miss out on spending valuable time with his family.

8.      Dialysis was simply too demanding for Mr. Fields to enjoy any semblance of a normal life. Mr. Fields experienced significant daily pain, had a massive loss of energy, and issues with his blood pressure and veins. Additionally, his diet was severely impacted as he had to limit his intake of water and protein.

9.    From the moment he went on dialysis, Mr. Fields experienced emotional worry and stressed about his future.

10.    Additionally, Mr. Fields experienced grave financial difficulties from no longer being able to work. Mr. Fields depleted his retirement savings to financially get by. This greatly impacted Mr. Fields's retirement plans and life goals.

11.    Mr. Fields was on the organ-donor waitlist at Tampa General and AdventHealth—biding his time and nursing his health until either hospital could find a match.

12.    The source of Mr. Fields's prolonged wait for a kidney and related harms? Defendants' use of the race-based coefficient to taint Mr. Fields's—and countless other Black patients'—eGFR scores. Defendants now admit these scores were artificially adjusted in a racist manner from the beginning.

13.    In June of 2022, UNOS admitted the racially discriminatory nature of the race-based coefficient for Black Americans. Thereafter, UNOS approved "a measure to require transplant hospitals to use a race-neutral calculation when estimating a patient's level of kidney function." In its press release, UNOS explained:

> For a number of years, some eGFR calculations have included a modifier for patients identified as Black. This practice has led to a systemic underestimation of kidney disease severity for many Black patients. Specifically in organ transplantation, it may have negatively

affected the timing of transplant listing or the date at which candidates qualify to begin waiting time for a transplant.[1]

14.     Despite prohibiting future use of the race-based coefficient, for six months, UNOS did nothing to adjust wait times for Black Americans already on the kidney waitlist.

15.     In January of 2023, UNOS for the first time instructed transplant hospitals to notify Black candidates of the policy change and investigate whether Black members of their waitlists were eligible for a wait time modification. But UNOS only gave transplant hospitals *an entire year* to complete this process, until January of 2024.

16.     Through this process, in approximately October of 2023, Mr. Fields was first informed over the phone by Tampa General that he was receiving a 2.5-year wait time adjustment.[2] In other words, absent Defendants' use of the race-based coefficient, Mr. Fields would have qualified to join the waitlist 2.5 years earlier. After years of delay, Mr. Fields finally received a kidney transplant in December of 2023.

---

[1] This Press release is publicly available at https://unos.org/news/optn-board-approves-elimination-of-race-based-calculation-for-transplant-candidate-listing/.

[2] To be clear, prior to this time, Mr. Fields was never informed and was thus unaware that the race-based coefficient was applied to his eGFR score. Mr. Fields was further never informed and thus unaware that his accrual of wait time had been delayed.

17.     Defendants' admitted discrimination against Black Americans by use of the race-based coefficient, at minimum, ruined Mr. Fields's life through years of delay and resulting debilitating dialysis treatments, rendering Mr. Fields unable to continue his previously successful career. There must be serious consequences for hospitals and transplant organizations that engage in such racist discrimination.

## PARTIES

18.     Mr. Fields was and is a citizen of the State of Florida, who resides in Orlando, Florida.

19.     Defendant UNOS is a Virginia nonprofit corporation with its principal place of business at 700 N 4th Street, Richmond, Virginia 23219.

20.     Tampa General is a hospital engaged in the provision of health care services and is operated by Florida Health Sciences Center, Inc., located at 1 Tampa General Circle, Tampa, Florida 33606.

21.     AdventHealth is a hospital engaged in the provision of health care services and is operated by Adventist Health System Sunbelt Healthcare Corporation and/or Adventist Health System/Sunbelt, Inc., located at 601 E Rollins Street, Orlando, Florida 32803.

## JURISDICTION AND VENUE

22.     This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 because Mr. Fields asserts a federal cause of action

alleging racial discrimination. This Court further has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367.

23.    Venue in this District is proper pursuant to 28 U.S.C. § 1391 because Mr. Fields has been affected by Defendants' unlawful policies and procedures within this District. Each of the Defendants have transacted with Mr. Fields within the District, thus, a substantial part of the events or omissions that gave rise to the claims asserted herein occurred within this District.

24.    This Court has personal jurisdiction over UNOS because UNOS conducts operations within Florida by virtue of its management of the kidney donor list for all patients residing within the State, including Mr. Fields. UNOS makes decisions as to which patients residing in Florida will be offered donor kidneys.

25.    This Court has personal jurisdiction over Tampa General because Tampa General maintains its principal place of business within the State, and harmed Mr. Fields by virtue of the unlawful conduct alleged herein within this State.

26.    This Court has personal jurisdiction over AdventHealth because AdventHealth maintains its principal place of business within the State, and harmed Mr. Fields by virtue of the unlawful conduct alleged herein within this State.

## GENERAL ALLEGATIONS

**A.**    **The national kidney transplant waitlist is controlled by the Defendants, and wait time is the primary factor considered in awarding donor kidneys**.

27.    In 1984, Congress passed the National Organ Transplant Act (NOTA), creating the Organ Procurement & Transplant Network ("OPTN"), which was tasked with maintaining a national registry for organ matching. Per the Act, this registry was to be operated by a private, non-profit organization under federal contract.[3]

28.    Since that time, UNOS has acted as that private, non-profit organization which operates the OPTN. As its website declares, UNOS "[m]anag[es] the national transplant waiting list, matching donors to recipients 24 hours a day, 365 days a year." UNOS establishes and implements policy concerning how donor kidneys will be awarded to patients with kidney disease.

29.    To be placed on the national kidney transplant waitlist, a patient must first visit one of 200+ transplant hospitals and receive a referral from his physician. In this way, transplant hospitals, like the transplant Hospital Defendants sued herein, serve as gatekeepers to patients seeking to be placed on the national kidney waitlist.

30.    Transplant hospitals like the Hospital Defendants serve as UNOS's agents in dealing with kidney disease patients. That is, UNOS is obligated to manage

---

[3] Patients can also seek a kidney from a private donor, such as a family member or friend, at the same time as they wait for a kidney on the national waitlist.

the national kidney waitlist, but put policies in place where it does not allow kidney disease patients to apply for inclusion on the kidney transplant waitlist directly through UNOS. Again, kidney disease patients must be referred by an approved transplant hospital.

31.    The national kidney waitlist is maintained using UNOS software, known as UNet. When a new patient is added to the waitlist, the referring hospital enters the patient's name and relevant medical information, including patient race and eGFR scores, into the UNet software, which tracks patient medical information and wait time.

32.    Each time a donor kidney becomes available, UNet's algorithm considers the information maintained in UNet, generates a list of potential matches, and ranks potential matches on the national kidney waiting list. These kidneys are then offered to patients through the transplant hospitals, in accordance with the UNet-generated rankings.

33.    Upon information and belief, the primary factor considered by UNet's algorithm to rank candidates for potentially compatible kidneys is a patient's accrued wait time. In other words, UNet will identify patients that are a medical match for a particular available kidney, and then rank those patients according to wait time.

34.     Importantly, referral to the waitlist does not automatically start the clock on qualifying wait time. To accrue qualifying wait time, either a patient's eGFR score must fall below 20 ml/min or the patient must begin dialysis.

**B.      The Defendants applied a racially discriminatory coefficient to Black patients' eGFR scores.**

35.     UNOS is responsible for enacting policy that determines which patients receive which donor kidneys. In this regard, UNOS offers as one of its strategic goals to "[p]rovide equity in access to transplants[.]" UNOS has fallen far short of its stated goal.

36.     Until earlier in 2024, the UNOS and OPTN boards were identical, meaning that the combined UNOS/OPTN board was the entity that voted on and approved policies appearing in the OPTN policy manual, including those governing allocation of kidneys.

37.     For decades, the race-based coefficient was applied to artificially inflate eGFR scores for Black Americans. Both of the commonly administered eGFR tests included the race-based coefficient, one of 16% and the other 21%, based upon the underlying assumption that Black Americans have greater muscle mass and thus naturally have more creatinine in their bodily systems.

38.     As noted above, patients do not begin accruing wait time on the national kidney waitlist until their eGFR score reaches 20 ml/min. But for Black patients,

even when their unadjusted eGFR score fell below 20 ml/min, the race-based coefficient artificially inflated their eGFR scores above 20 ml/min, preventing them from qualifying to accrue wait time. Thus, Black patients' eGFR scores had to fall well below 20 ml/min before they began to accrue wait time.

39.   This practice led to many Black kidney disease patients never qualifying for wait time by eGFR score because their addition to the waitlist was delayed until the patients had to start dialysis (which is recommended when kidney function falls below 15 ml/min).

40.   UNOS's agent transplant hospitals, including the Hospital Defendants, also had a policy of applying the race-based coefficient to Black patients' eGFR scores. Because the transplant hospitals are required by UNOS to measure and provide patients' eGFR scores, this conduct by the transplant hospitals is within the scope of their agency.

41.   UNOS at all times knew its agent transplant hospitals were using the race-based coefficient, and despite its authority to ban the practice, as evidenced by the rules passed in 2022 and 2023, did nothing to stop the transplant hospitals for more than two decades. Indeed, it was UNOS that created the policy which set 20 ml/min as the cutoff point to accrue wait time with knowledge that the tests in common usage to test eGFR included the race-based coefficient.

42.     UNOS knew at all relevant times that the transplant hospitals' use of the race-based coefficient resulted in delayed referrals and accrual of wait time for Black kidney disease patients, as the transplant hospitals entered the impacted data into UNOS's UNet program. With knowledge that its UNet program was full of race-based coefficient-impacted wait time data, UNOS knowingly and intentionally used that race-based coefficient impacted data when running its algorithm to determine to whom to offer a kidney.

43.     The above shows a policy and practice of use of the race-based coefficient directly by UNOS. Again, UNOS's UNet system was full of eGFR scores that incorporate the race-based coefficient-impacted wait time calculations, and those wait time calculations are weighed heavily within the UNet algorithm in determining which patients will be awarded a donor kidney. Moreover, UNOS at all times knew that its UNet system was full of race-based coefficient-impacted data such that UNOS's decision to use that data in its algorithm was a conscious decision to itself use the race-based coefficient.

44.     UNOS is also liable for the transplant hospitals' use of the race-based coefficient. UNOS enacted policies and bylaws that required transplant hospitals to act as its agents in referring patients to the waitlist and gathering relevant medical information from patients, tasks UNOS itself would otherwise be required to do. UNOS knew for decades that its transplant hospitals were using the race-based

12

coefficient on UNOS's behalf, could have banned transplant hospitals from doing so, but failed to do so, despite knowledge that the race-based coefficient is discriminatory against Black patients.

45.   The Hospital Defendants applied the race-based coefficient to eGFR scores and entered the modified eGFR scores into UNOS's UNet system. The Hospital Defendants also acted as UNOS's gatekeeper to the national kidney waitlist, refusing to make referrals for Black kidney disease patients that would have a qualifying eGFR score but for use of the race-based coefficient. This practice delayed Mr. Fields from being added to the waitlist and accruing wait time.

46.   There has never been any serious scientific research to support use of the race-based coefficient to artificially increase Black patients' eGFR scores. Instead, the race-based coefficient is based on eugenics-style racism and stereotypes that assume Black Americans are more physically fit than White Americans and other racial groups.

47.   This, of course, is junk science supported only by racial stereotypes, and not any valid scientific studies. As described in an article titled *Systemic Kidney Transplant Inequities for Black Individuals: Examining the Contribution of Racialized Kidney Function Estimating Equations*, the theory supporting the race-based modification to Black patients' eGFR scores has "not been substantiated by rigorous scientific evidence[.]"

48.     Use of the race-based coefficient seriously diminishes Black patients' chances of receiving a donor kidney. Indeed, because of this eGFR manipulation, many Black patients never qualified to accrue wait time because of their eGFR score, and only began to accrue wait time when they began dialysis.

49.     The above-described practices have resulted in non-Black patients receiving numerous kidneys that would otherwise have been given to Black applicants had their wait time been calculated without consideration of race.

C.     **Even after UNOS admitted that the race-based coefficient discriminates against Black Americans, Defendants refused to timely address the problem**.

50.     In June of 2020, UNOS acknowledged the racial inequity plaguing the transplant system and the need for reform. In an article found at https://unos.org/news/racial-equity-in-transplantation/, UNOS professed a "commitment" to "saving and improving lives through transplantation, regardless of background, including race and ethnicity." But the race-based coefficient would remain in effect for years to come.

51.     In June of 2022, UNOS admitted the racially discriminatory nature of the race-based coefficient for Black Americans, approving "a measure to require transplant hospitals to use a race-neutral calculation when estimating a patient's level of kidney function." In its press release, UNOS explained that:

For a number of years, some eGFR calculations have included a modifier for patients identified as Black. This practice has led to a systemic underestimation of kidney disease severity for many Black patients. Specifically in organ transplantation, it may have negatively affected the timing of transplant listing or the date at which candidates qualify to begin waiting time for a transplant.[4]

52.    UNOS posted the following passage on its website:



**What are other issues with the race variable in eGFR?**

EGFR calculations rely on a binary approach to race. When the race variable is used in formulas, eGFR calculators only offer two response options: "Black" or "Not Black."

These options do not include a designation for mixed race or multi-racial individuals, and do not account for the existing genetic diversity within the Black population. The concept of race is a social construct and an unreliable proxy for genetic difference, therefore not a biological marker or clinical measure.

53.    UNOS's policy officially changed on July 27, 2022, with UNOS's policy prior to that time expressly allowing for use of the race-based coefficient to artificially increase Black patients' eGFR scores.

---

[4] This Press release is publicly available at https://unos.org/news/optn-board-approves-elimination-of-race-based-calculation-for-transplant-candidate-listing/.

15

54.    Nonetheless, UNOS continued to use the race-based coefficient as a default. For more than six months, UNOS took no affirmative steps to adjust wait times and correct for previous use of the race-based coefficient.

55.    On January 5, 2023, UNOS announced a new policy that would require donor hospitals to provide two notifications to patients on the national kidney waitlist, one notifying patients that Black Americans will be considered for wait time adjustments where the race-based coefficient delayed their accrual of wait time, and a second notification confirming this process was completed and informing patients of their status. UNOS also directed donor hospitals to investigate which patients were eligible for a wait time adjustment, and to request said adjustments with UNOS within a year, i.e., by January of 2024.

56.    While this adjustment in policy rightfully acknowledged the racially discriminatory nature of the race-based coefficient, it lacked the requisite urgency, and for many of the 27,500 Black Americans then on the national kidney waitlist, like Mr. Fields, the policy change was too little too late. During the 18 months of lag time in adjusting wait times, Black Americans continued to suffer a race-based disadvantage in their candidacy for a donor kidney, with UNet continuing to utilize the old, improperly calculated wait times when awarding kidneys.

57.    Indeed, as discussed below, Mr. Fields experienced serious pain, financial distress, and emotional distress near the end of the time period provided by

UNOS for transfer hospitals to correct their wait time calculations, that could have been avoided had Defendants moved faster.

**D.**   **As a result of not being awarded a kidney in the transplant market earlier, Mr. Fields has suffered significant harms**.

58.   Had the race-based coefficient not been applied to Mr. Fields's eGFR score, he would have been eligible to accrue wait time 2.5 years earlier.

59.   Despite having suffered from kidney disease for many years, and beginning dialysis in July of 2022, Mr. Fields was first placed on the waitlist at AdventHealth in March of 2023. Additionally, around May of 2023, Mr. Fields began evaluation for placement on the waitlist at Tampa General. He was not placed on the waitlist there until October 11, 2023. On November 2, 2023, he received a letter from Tampa General confirming a wait time adjustment of 2.5 years.

60.   Since that time, until receiving a transplant in late 2023, Mr. Fields underwent dialysis four times a week, for approximately five hours each time. He had to be awake during dialysis and therefore the treatment occurred during the day. Mr. Fields's wife helped him with the dialysis. Since he was dependent on his wife to help with dialysis and because dialysis takes up a large portion of his day, this placed a great strain on his family. He was unable to travel and was forced to structure his days around his dialysis treatments. Being forced to do dialysis four

times a week for approximately, five hours each session caused Mr. Fields to miss out on spending valuable time with his family.

61.   The treatment was unpleasant and drained Mr. Fields's physical and mental energy.

62.   Mr. Fields was unable to resume his six-figure-income career and instead was forced to rely on his retirement savings to make ends meet while also sacrificing future career advancement by way of anticipated promotions.

63.   Mr. Fields's kidney disease required him to go through a litany of expensive, unpleasant medical procedures, resulting in physical pain, an inability to work or enjoy life, and severe emotional distress.

64.   Even though Mr. Fields has survived his kidney transplant, Mr. Fields must still contend with the additional wait time caused by use of the race-based coefficient that he will never get back.

65.   This would have all been avoided had Defendants not discriminated against Mr. Fields.

## **FIRST CAUSE OF ACTION**

**(Violation of Title VI of the Civil Rights Act of 1964—Against All Defendants)**

66.   Mr. Fields re-alleges and incorporates herein by reference, as though set forth in full, each of the allegations set forth above.

67.   This cause of action is brought by Mr. Fields against all Defendants.

68.    UNOS and each of the Hospital Defendants receive significant financial assistance from the Federal government.

69.    In this regard, approximately 10% of UNOS's budget is provided by the Federal government, in accordance with the National Organ Transplant Act's authorization of $7,000,000/year to fund a private, non-profit entity such as UNOS. These contracts were intended by the Federal government to act as a subsidy to UNOS, not as compensation for any goods or services provided by UNOS to the Federal government, for which there are none.

70.    Moreover, UNOS's audited financial statements describe this Federal government payment as a "Grant" and include a corresponding "Federal Assistance Lending Number." Upon information and belief, this number relates to Federal government "Assistance Listings" which, pursuant to the Federal government-run SAM.gov, "are detailed public descriptions of federal programs that provide grants, loans, scholarships, insurance, and other types of assistance awards."

71.    The legislative history also confirms that the legislative intent behind the payments was not to purchase anything from UNOS, but instead to provide financial assistance:

- Rep. Pallone stated, "this legislation will provide critical funding to ensure the OPTN has resources it needs to continue to perform its valuable services to our Nation." 154 Cong. Rec. H8668-01, 2008 WL 4329712, at *H8669.

- Rep. Burgess stated, "This bill increases the authorized funding for the Organ Procurement and Transplantation Network, which has not been increased since 1984.

The Organ Procurement and Transplantation Network provides coordination between individuals in need of an organ transplant and donor organs made available from deceased donors. I support the increased authorization levels for the program, which currently represent only 7 percent of the operating cost for this valuable resource." *Id.* at *H8670.

- Rep. Jackson-Lee stated, "It is time to help patients, all across the country, in need of lifesaving transplants of not just the kidney, but also heart, liver, lung and other vital organs." *Id.*

72.    Each of the Hospital Defendants receive significant financial assistance from the federal government and its programs, funding both patient care and other related operations.

73.    Defendants have engaged in racial discrimination. As alleged in detail above, Defendants allowed and encouraged use of the race-based coefficient to artificially inflate Black patients', including Mr. Fields's eGFR scores, with UNOS adopting, encouraging, and implementing the race-based coefficient, and the Hospital Defendants applying the race-based coefficient directly, thus delaying Mr. Field's accrual of wait time, and prejudicing his chances of receiving a donor kidney.

74.    Defendants further knowingly input and used these modified wait times for Black patients in UNOS's UNet software, causing Black patients to be ranked lower for specific donor kidneys than non-Black patients. Even after UNOS admitted the practice was racially discriminatory, Defendants failed to take prompt action to ensure Black patients' (including Mr. Fields's) wait times were recalculated.

75.    The damages resulting from the above-described racial discrimination include but are not limited to depriving and/or delaying Mr. Fields's award of a donor kidney. This discrimination also caused Mr. Fields to incur economic injuries, including but not limited to, continued medical costs such as dialysis costs, and lost wages stemming from an inability to resume work because of additional dialysis treatments and other resulting medical conditions caused by application of the race-based coefficient by Defendants.

76.    The above-described racial discrimination caused additional damages including but not limited to pain and suffering, severe emotional distress and accompanying stress about the future, constant fatigue, the inability to travel, and the loss of enjoyment of life.

## SECOND CAUSE OF ACTION

### (Breach of Fiduciary Duty—Against the Hospital Defendants)

77.    Mr. Fields re-alleges and incorporates herein by reference, as though set forth in full, each of the allegations set forth above.

78.    As the transplant hospitals for Mr. Fields, the Hospital Defendants owed Mr. Fields a fiduciary duty. The Hospital Defendants acted as an intermediary between Mr. Fields and the market for donor kidneys, similar to how a stockbroker operates for his clients' benefit in the financial markets. Mr. Fields, having no ability to communicate with UNOS or advocate for himself, trusted and relied on the

Hospital Defendants to act in his best interests in obtaining for him a life-saving kidney.

79.     The Hospital Defendants breached their fiduciary duties by engaging in racial discrimination against their fiduciary.

80.     Specifically, the Hospital Defendants breached their fiduciary duties by failing to inform Mr. Fields of their use of the race-based coefficient to adjust his eGFR score, and knowingly submitting eGFR scores tainted by use of the race-based coefficient to UNOS for inclusion in the UNet algorithm, prejudicing Mr. Fields's chances of receiving a donor kidney. Even after UNOS changed course and prohibited the use of the race-based coefficient, the Hospital Defendants failed for more than a year to recalculate Mr. Fields's wait time.

81.     The damages resulting from the above-described racial discrimination include but are not limited to depriving and/or delaying Mr. Field's award of a donor kidney. This discrimination also caused Mr. Fields to incur economic injuries, including but not limited to, continued medical costs such as dialysis costs and lost wages stemming from an inability to resume work because of additional dialysis treatments and other resulting medical conditions caused by application of the race-based coefficient by Defendants.

82.     The above-described breach of fiduciary duty caused additional damages including but not limited to pain and suffering, severe emotional distress

and accompanying stress about the future, constant fatigue, the inability to travel, and the loss of enjoyment of life.

## THIRD CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress—Against All Defendants)

83.    Mr. Fields re-alleges and incorporates herein by reference, as though set forth in full, each of the allegations set forth above.

84.    Defendants' conduct, as described in this Complaint, can only be described as so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

85.    Defendants' extreme and outrageous conduct, intentionally and/or recklessly caused Mr. Fields the harms and damages described herein, including severe emotional distress.

86.    The above-described outrage caused additional damages including, but not limited to, pain and suffering and severe emotional distress resulting in a looming fear of death, constant fatigue, the inability to travel, and the loss of enjoyment of life.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Fields prays for relief against Defendants as follows:

1.    For damages in compensation for the economic, medical, personal injuries, and pain and suffering sustained by the Mr. Fields in an amount to be determined by evidence;

2.    For punitive damages in an amount according to proof;

3.    For pre-judgment interest on all damages awarded by this Court;

4.    For reasonable attorneys' fees and costs of suit incurred herein; and

5.    For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues so triable as a matter of right.


DATED: August 2, 2024              Respectfully submitted,

By: /s/ *Natalia M. Salas*
Natalia M. Salas (Fla. Bar No. 44895)
nsalas@ferrarolaw.com
Angelica L. Novick (Fla. Bar No. 105069)
anovick@ferrarolaw.com
**THE FERRARO LAW FIRM, P.A.**
Brickell World Plaza
600 Brickell Avenue, Suite 3800
Miami, Florida 33131
Tel: (305) 375-0111
Fax: (305) 379-6222

Matthew L. Venezia
(*Pro hac vice* forthcoming)
mvenezia@ellisgeorge.com
George Laiolo
(*Pro hac vice* forthcoming)
glaiolo@ellisgeorge.com
**ELLIS GEORGE LLP**

2121 Avenue of the Stars, 30th Floor
Los Angeles, CA 90067

*Attorneys for Plaintiff*