UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| CORTEZ FIELDS,<br>            Plaintiff,<br>    vs.<br>UNITED NETWORK FOR ORGAN SHARING; FLORIDA HEALTH SCIENCES CENTER, INC., D/B/A TAMPA GENERAL HOSPITAL; ADVENTIST HEALTH SYSTEM SUNBELT HEALTHCARE CORPORATION, D/B/A ADVENTHEALTH; ADVENTIST HEALTH SYSTEM/SUNBELT, INC.,<br>            Defendants. | Case No. 6:24-CV-01434-JSS-DCI |

**PLAINTIFF CORTEZ FIELDS'S RESPONSE IN OPPOSITION TO DEFENDANT ADVENTIST HEALTH SYSTEM/SUNBELT, INC.'S MOTION TO DISMISS**

**INTRODUCTION**

Defendant Adventist Health System/Sunbelt, Inc. d/b/a AdventHealth Orlando ("AdventHealth") engaged in intentional discrimination against Plaintiff Cortez Fields ("Mr. Fields") because he is Black. In 1999, a group of researchers promulgated a formula for estimating kidney function that artificially adjusted the kidney-function scores of only Black patients, making Black patients' kidneys seem healthier than they were in reality. This formula, and its use of the "race-based coefficient," was based on the stereotypical assumption that Black patients had bigger muscles than non-Black patients. AdventHealth used this race-based coefficient—applied only to Black patients like Mr. Fields—to artificially inflate Mr.

1

Fields's kidney function score, delaying his accrual of wait time, and prejudicing his chances of receiving a life-saving donor kidney. Now, AdventHealth seeks to evade liability for its discriminatory acts. AdventHealth's arguments do not persuade otherwise, for the following reasons:

*First*, Title VI applies to AdventHealth, and AdventHealth's conduct toward Mr. Fields violated Title VI. AdventHealth argues that Mr. Fields "is really complaining about . . . the actions and policies of UNOS and OPTN, not AdventHealth Orlando." ECF No. 48 ("Motion") at 11. But Mr. Fields states claims against both UNOS and AdventHealth, because the Complaint alleges that AdventHealth intentionally applied a race-based formula to Mr. Fields, causing him harm, simply because he is Black.

*Second*, Mr. Fields is not impermissibly splitting claims. The class action cited by AdventHealth excludes Black patients like Mr. Fields who file individual claims to seek personal injury-type damages. AdventHealth is not a party in that class action.

*Third*, AdventHealth had a fiduciary duty to Mr. Fields, and its disparate treatment of Mr. Fields based solely on his race, harming his health, breached that duty.

*Fourth*, Mr. Fields states a claim for intentional infliction of emotional distress ("IIED") because unequal medical care based on race is outrageous.

*Fifth*, Mr. Fields properly prays for personal-injury damages, pain and suffering, and attorneys' fees under causes of action permitting recovery of those

damages. Though Title VI does not allow for recovery of emotional distress or punitive damages, Mr. Fields does not seek such damages under Title VI; he seeks them in relation to his IIED and breach of fiduciary duty claims, which allow for those damages. Similarly, he seeks attorneys' fees under Title VI, and federal law expressly allows prevailing parties to recover attorneys' fees in Title VI claims.

**SUMMARY OF PLAINTIFF'S FACTUAL ALLEGATIONS[1]**

**A.      AdventHealth provides data considered by UNOS when determining who will receive donor kidneys**.

In 1984, Congress passed the National Organ Transplant Act ("NOTA"), creating the Organ Procurement & Transplant Network ("OPTN"), which was tasked with maintaining a national registry for organ matching to be operated by a private, non-profit organization under federal contract. FAC ¶ 26. Since 1984, UNOS has served as that private, non-profit organization, and per its website, UNOS "[m]anag[es] the national transplant waiting list, matching donors to recipients 24 hours a day, 365 days a year." *Id.* ¶ 27. UNOS is further empowered to establish and implement policy concerning how donor organs will be awarded to patients in need, including kidneys. *Id.*

---

[1] AdventHealth requests the Court take judicial notice of 85 pages of supporting exhibits, including UNOS webpages and journal and news articles. Motion at 2–10, Exhibits. The Court should not take judicial notice of these documents because only facts "outside the area of reasonable controversy" meet the bar. *See McGuire v. J.G. O'Neill, Inc.*, 2023 WL 8463516, at *2 (S.D. Fla. Oct. 5, 2023). The effect of taking judicial notice "is to preclude a party from introducing evidence and in effect, directing a verdict against him as to the fact noticed," and the facts "must be one that only an unreasonable person would insist on disputing." *U.S. v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994). It would be premature to rule, before discovery, that every fact contained in these un-pleaded 85 pages are not reasonably disputed.

3

AdventHealth is a hospital engaged in the provision of health care and kidney transplantation services. *Id.* ¶ 21. In order to be recognized and to operate as a transplant hospital, AdventHealth contracted with UNOS and agreed to abide by the UNOS/OPTN policies and bylaws. *Id.* ¶ 29.

UNOS manages the national kidney waitlist using its UNet software, which maintains candidates' medical information, including eGFR scores, and tracks wait times. *Id.* ¶ 30. Each time a donor kidney becomes available, UNet runs an algorithm that considers the information maintained in UNet and generates a ranked list of potential matches, with qualifying wait time being the primary factor considered. *Id.* ¶¶ 31–32. In other words, UNet will identify patients that are a medical match for a particular available kidney, and then rank those patients according to qualifying wait time. *Id.* ¶ 32.

The only way patients can be listed on the national kidney waitlist is referral by a transplant hospital, like AdventHealth. *Id.* ¶¶ 28–29. In turn, AdventHealth must register a transplant patient and enter their medical information considered by UNOS's algorithm into UNet, including eGFR scores. *Id.* ¶¶ 28–31. In other words, AdventHealth directly applied the race-based coefficient to Mr. Fields's eGFR score, and delayed referral to the national kidney waitlist for Black patients, including Mr. Fields, by requiring that their eGFR scores be well below 20 ml/min before referral. *Id.* ¶¶ 36–39, 44.

**B.** **AdventHealth's use of the race-based coefficient discriminates against its Black patients seeking donor kidneys, including Mr. Fields**.

4

When tests to estimate GFR were developed, a few flawed studies indicated Black Americans had higher creatinine extraction rates. Rather than consider whether this difference could be caused by non-racial alternative factors, it was postulated by the developers of the eGFR test that Black Americans' scores could be explained because Black Americans have more muscle mass and thus more creatinine in their systems than non-Black Americans. *Id.* ¶¶ 2, 45–46. Based on this postulation, the creators of the eGFR test added a race-based modifier to eGFR scores, known as the "race-based coefficient," which artificially inflates the scores of Black patients by 16–21 percent. *Id.* ¶ 36. That is, eGFR is calculated irrespective of race, and then only for Black patients like Mr. Fields, the score is increased by 16–21 percent, materially delaying their chance at qualifying for a transplant. *Id.* ¶¶ 36–39, 44–47. As to AdventHealth specifically, the delay caused Mr. Fields to suffer for a longer period than if the race-based coefficient had never been applied to his eGFR score, including pain, financial distress, and emotional distress that could have otherwise been avoided. *Id.* ¶ 56.

Had the race-based coefficient not been applied to Mr. Fields's eGFR scores, he would have qualified to join the waitlist earlier than when AdventHealth first registered him. *Id.* ¶ 57. Mr. Fields underwent an eGFR test at AdventHealth in February of 2019. *Id.* ¶ 58. This test listed Mr. Fields's "eGFR African American"—indicating AdventHealth's use of the race-based coefficient—score as 21 ml/min. *Id.* ¶ 59. But if Mr. Fields had not been Black, AdventHealth would not have adjusted his eGFR score because of his race, and his eGFR score would have been

5

below 20 ml/min, qualifying him to join the waitlist. *Id.* ¶ 60. This score would have qualified Mr. Fields to begin accruing wait time. *Id.* However, Mr. Fields was not added to the waitlist until July of 2022 when he began dialysis. *Id.* ¶ 6, 38.

The race-based coefficient was junk science based on the defunct racial stereotype that Black people have bigger muscles. *Id.* ¶¶ 45–46. Before this lawsuit, UNOS admitted the race-based coefficient is "unreliable." *Id.* ¶ 51; *see also id.* ¶ 50 (UNOS's press release explained that the race-based coefficient "has led to a systematic underestimation of kidney disease severity for many Black patients. Specifically in organ transplantation, it may have negatively affected the timing of transplant listing or the date at which candidates qualify to begin waiting time for a transplant."). Simply put, the race-based coefficient unfairly prejudiced Black patients' chances of receiving a donor kidney when compared to other races, increasing wait times even for those who received a kidney. *Id.* ¶¶ 34–48.

C.   **Even after UNOS banned the race-based coefficient, AdventHealth failed to timely update its patients' wait time calculations, including for Mr. Fields**.

In June of 2022, after many years of knowingly allowing for and encouraging use of the race-based coefficient, UNOS announced that transfer hospitals were no longer allowed to use the race-based coefficient. *Id.* ¶¶ 49–52. But UNOS sat on its hands until January of 2023 before it instructed donor hospitals to process wait time adjustments for impacted Black waitlist members. *Id.* ¶¶ 53–54. With no sense of urgency, UNOS allowed transplant hospitals another year, until January

of 2024—18 months after UNOS's original policy change—to determine whether their patients were entitled to a wait time adjustment. *Id.* ¶ 54.

Similar to UNOS, AdventHealth had little sense of urgency to update its Black patients' wait times or to explain what happened to impacted patients. AdventHealth did not submit an application for a wait-time adjustment for Mr. Fields until October of 2023. *Id.* ¶ 62. AdventHealth attached to the application the test from February of 2019 that artificially increased Mr. Fields's "eGFR African American" score. *Id.* That is, even where UNOS banned the race-based coefficient and admitted its discriminatory nature in June of 2022, AdventHealth did nothing to update Mr. Fields's wait time score until October of 2023. *Id.* ¶¶ 49–52, 62.

Because Mr. Fields is Black, AdventHealth admittedly (and wrongfully) applied the race-based coefficient to Mr. Fields's eGFR score. That race-based act caused Mr. Fields to endure an unnecessarily prolonged wait for placement on the organ waitlist, and for receipt of a donor kidney *Id.* ¶ 63.

**D.    <u>Mr. Fields suffered damages caused by the race-based coefficient</u>**.

While on the waitlist at AdventHealth, Mr. Fields, at the recommendation of a physician, joined the waitlist at another transplant hospital with the hopes that he'd receive a kidney transplant there sooner. *Id.* ¶ 65. After years of delay, Mr. Fields was finally able to receive a donor kidney in December of 2023 at the other transplant hospital. *Id.* ¶¶ 17, 65. But until Mr. Fields received that transplant, he endured dialysis four times a week, for approximately five hours each session. *Id.* ¶ 66. Mr. Fields had to be awake during dialysis, and therefore, the treatment

occurred during the day. *Id.* Dialysis treatment was grueling for Mr. Fields, placing a great strain on him physically and mentally, as well as on his family. *Id.* ¶¶ 66–67. Mr. Fields was unable to resume his six-figure-income career and instead was forced to rely on his retirement savings to make ends meet while also sacrificing future career advancement by way of anticipated promotions. *Id.* ¶ 68. This would have all been avoided had UNOS and AdventHealth not discriminated against Mr. Fields when they applied the race-based coefficient to him. *Id.* ¶ 71.

**ARGUMENT**

A.   **Plaintiff states a claim against AdventHealth for violation of Title VI**.

    1.   **AdventHealth receives federal funding sufficient for Title VI liability**.

Entities receiving federal financial assistance are subject to liability under Title VI. *Alexander v. Sandoval*, 532 U.S. 275, 278 (2001). The financial assistance need not relate to the discriminatory conduct at issue; the receipt of assistance alone is sufficient. *U.S. v. Harris Methodist Fort Worth,* 970 F.2d 94, 97, n. 1 (5th Cir. 1992) (holding Civil Rights Restoration Act of 1987 mandates that Title VI apply "on an institution-wide basis, instead of only in connection with a limited program activity actually receiving federal funds….") (citing *Leake v. Long Island Jewish Medical Center*, 695 F. Supp. 1414, 1416 (E.D.N.Y. 1988), *aff'd*, 869 F.2d 130 (2d Cir. 1989)); *Silva v. St. Anne Catholic School*, 595 F.Supp.2d 1171, 1181 (D. Kan. 2009) (holding that where a claim is brought for intentional discrimination, "an organization can be considered a recipient of federal funds for the purposes of

8

Title VI on an institution wide basis."); *see also* Dept. of Justice, TITLE VI LEGAL MANUAL, Section V: Defining Title VI—Subheading C.3, "Why Establish Federal Financial Assistance?" ("The financial assistance does not have to relate to a program in which the complainant participates or seeks to participate or used for the complainant's benefit. Rather, an agency only has to prove that the entity received federal financial assistance when the alleged discrimination occurred") (citing *Howe v. Hull*, 874 F. Supp. 779, 789 (N.D. Ohio 1994); *Estate of Alcalde v. Deaton Specialty Hosp. Home, Inc.*, 133 F. Supp. 2d 702, 708 (D. Md. 2001)).[2]

Plaintiff's allegations that AdventHealth receives federal financial assistance—for patient care, as a Medicare provider, and through Covid-19 relief (FAC at ¶ 78–79)—are sufficient to defeat the Motion. *PAS Commc'ns, Inc. v. U.S. Sprint, Inc.*, 112 F. Supp. 2d 1106, 1111 (D. Kan. 2000) ("In their complaint, plaintiffs allege that defendant receives 'federal financial assistance subject to institution-wide coverage' under Title VI. Accepting this allegation as true (as the court is compelled to do at this stage of the proceedings), the court concludes that plaintiffs have stated a claim under Title VI."). Indeed, where this point is disputed, "the vast majority of courts . . . have concluded that the resolution of the issue requires inquiry into factual matters outside the complaint and, accordingly, is a matter better suited for resolution after both sides have conducted discovery on the issue." *Id*. at 1111 (collecting cases).

---

[2] https://www.justice.gov/crt/fcs/T6manual5 (last accessed November 8, 2024).

AdventHealth obscures Plaintiff's allegations about its federal funding by misconstruing his claim against AdventHealth as a "claim based on federal funding under the UNOS-HHS contract." Motion at 16. But UNOS's funding is irrelevant to AdventHealth—AdventHealth's own federal funding renders Title VI applicable.

### 2. AdventHealth engages in intentional racial discrimination.

AdventHealth ignores well-pleaded allegations when arguing the FAC does not allege AdventHealth was "actually aware that the use of the various eGFR formulas was intentionally discriminatory against" Mr. Fields. Motion at 15–16. The Motion further argues that Title VI does not permit disparate impact cases. Both arguments fail because Plaintiff plainly alleges disparate treatment by way of an express racial classification. FAC ¶¶ 44–48.

The Supreme Court recently reaffirmed that express racial qualifications, like the **race-based** coefficient, "must survive a daunting two-step examination known in our cases as 'strict scrutiny.'" *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181, 206 (quoting *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227 (1995)). Under strict scrutiny, the Court first considers "whether the racial classification is used to 'further compelling governmental interests.'" *Id.* at 206–07 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003)). The Court must "ask whether the government's use of race is 'narrowly tailored'—meaning 'necessary'—to achieve that interest." *Students for Fair Admissions*, 600 U.S. 181 at 207 (quoting *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 311–312 (2013)). This exacting analysis is required because

10

"[r]acial classifications are simply too pernicious to permit any but the most exact connection between justification and classification." *Students for Fair Admissions*, 600 U.S. at 217–18 (*quoting Gratz*, 539 U.S. at 270). Regardless of the purported motivation, racial classifications like the race-based coefficient are presumptively invalid. *See*, *Johnson v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234, 1264 (11th Cir. 2001). Such classifications provide **"the clearest form of direct evidence of discriminatory intent**." Dept. of Justice, TITLE VI LEGAL MANUAL, Section VI: Proving Discrimination – Intentional Discrimination, Subheading B, "Proving Intentional Discrimination" (emphasis added); *see id.* ("If a [defendant] explicitly . . . directs adverse action to be taken based on race, color, or national origin, such a policy or practice constitutes an express classification.").[3] The DOJ explains:

> **A recipient's express or admitted use of a classification based on race, color, or national origin established intent without regard to the decisionmakers' animus or ultimate objective.** Such classifications demonstrate a discriminatory purpose as a matter of law. *See Miller v. Johnson*, 515 U.S. 900, 904-05 (195); *see also Wittmer v. Peters*, 904 F. Supp. 845, 849-50 (C.D. I.. 1995), aff'd, 87 F.3d 916 (7th Cir. 1996). "Put another way, direct evidence of intent is 'supplied by the policy itself.'" *Hassan v. City of New York*, 804 F.3d 277, 295 (3d Cir. 2015) (quoting *Massarsky v. Gen. Motors Corp.*, 706 F.2d 111, 128 (3d Cir. 1983) (Slotiver, J., dissenting)).

*Id.* (cleaned up) (emphasis added). Again, the race-based coefficient presents such a racial classification. The modification was made to Black patients' scores solely because of their race and was not applied to other racial groups. FAC ¶¶ 44–48.

---

[3] CIVIL RIGHTS DIV., U.S. DEP'T OF JUSTICE, "Section VI-Proving Discrimination-Intentional Discrimination", https://www.justice.gov/crt/fcs/T6Manual6#:~:text=A%20Title%20VI%20discriminatory%20intent,%2C %20color%2C%20or%20national%20origin (last accessed on November 3, 2024).

Plaintiff alleges not only deliberate indifference to intentional racial discrimination, but disparate treatment based on race as well. AdventHealth used an express racial classification to Mr. Fields's detriment in the following ways: (1) AdventHealth applied the race-based coefficient to his kidney-function scores, despite the race-based coefficient being based on junk science assuming Black people had bigger muscles than people of other races (FAC ¶¶ 44–46, 58–59); (2) if Mr. Fields was not Black, AdventHealth would not have applied the race-based coefficient to his eGFR score, and Mr. Fields's unmodified eGFR score would have qualified Mr. Fields to join the waitlist and begin accruing wait time (*Id.* ¶ 60); and (3) many months after it became aware that UNOS banned transplant hospitals like AdventHealth from applying the race-based coefficient to Black patients' eGFR scores, AdventHealth submitted a wait time adjustment application on Mr. Fields's behalf to UNOS in October of 2023. *Id.* ¶ 62.

Contrary to AdventHealth's argument, Plaintiff does not present any disparate *impact* theory of liability. Rather, Plaintiff alleges AdventHealth and UNOS engaged in disparate *treatment* by way of an expressly discriminatory policy where the "race-based coefficient was applied to artificially inflate eGFR scores for Black Americans" by either 16% or 21%, depending upon which commonly administered eGFR test was used. FAC ¶ 36; *see also id.* ¶¶ 39–48.

As explored in more detail in the Opposition to UNOS's Motion to Dismiss, AdventHealth has not, and could not, show that using the race-based coefficient against Mr. Fields was narrowly tailored toward a compelling government interest.

The race-based coefficient relies on a racial stereotype, harms Black kidney disease patients, and is unnecessary because race-neutral alternatives exist.

### 3. **Plaintiff is not claim-splitting**.

AdventHealth next argues that Plaintiff's Title VI claim should be dismissed against it for "claim-splitting." In support of that argument, AdventHealth points the Court to a putative class action pending in the Central District of California in which Plaintiff's lead counsel here also serves as counsel. *See* Motion at 17. According to AdventHealth, Mr. Fields is included in a putative "National Waitlist Class" defined in that case as "All patients identified as Black on the national kidney waitlist . . . " *Id.* No class has been certified yet in *Randall*, nonetheless, the putative "National Waitlist Class" defined in that case **expressly excludes claims for personal injury damages**, which Mr. Fields asserts in this case. *See Anthony Randall v. UNOS, et al.*, Case No. 2:23-CV-02576 at Dkt No. 53, ¶ 64 (emphasis added). "[T]he federal claim splitting doctrine clearly requires identity of parties" and same is absent here. *See Robbins v. Gen. Motors De Mexico, S. DE R.L. DE CV.*, 816 F.Supp.2d 1261, 1264 (M.D. Fla. 2011) ("The defendants in the state court case and the case before this Court are not identical ... As such, the Court finds that claim splitting does not bar the Plaintiffs case."); *see also Zephyr Aviation III, L.L.C. v. Keytech Ltd.*, No. 8:07-CV-227-T-27TGW, 2008 WL 759095, at \*1 (M.D. Fla. Mar. 20, 2008) (declining to dismiss on claim splitting grounds where identity and privity of privity of parties was unclear); *O'Connor v. Warden, Fla. State Prison*, 754 F. App'x 940, 942 (11th Cir. 2019) (reversing

dismissal based on claim splitting and noting "[t]he claims in each case raise similar issues but arise out of separate incidents occurring during different periods of time, at different prison facilities, and against different defendants"). Mr. Fields is not splitting claims; he is pursuing his own individual claims distinct from the putative class defined in *Randall*.[4]

## B.     <u>**Plaintiff states a claim for breach of fiduciary duty**</u>.

In order to state a claim for breach of fiduciary duty, a plaintiff must allege: (1) the existence of a fiduciary duty; and (2) the breach of that duty such that it is the proximate cause of the plaintiff's damages. *See Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002). A fiduciary relationship arises when "confidence is reposed by one party and trust accepted by the other." *Brigham v. Brigham*, 11 So. 3d 374, 387 (Fla. Dist. Ct. App. 2009). Plaintiff's allegations satisfy the elements.

The relevant cases—including AdventHealth's—establish that healthcare providers owe their patients fiduciary duties. *See, e.g.*, *Knezevich v. Carter*, 805 F. App'x 717, 726 (11th Cir. 2020) (stating that "[i]in the context of healthcare provider–patient relationship[s], breach of fiduciary duty claims usually arise from the healthcare provider's unauthorized disclosure of confidential information," and affirming dismissal of breach claim after "assuming [plaintiff] and [defendant] had a fiduciary relationship as doctor and patient"); *Nardone v. Reynolds*, 333 So. 2d 25, 38 (Fla. 1976) (describing the doctor–patient relationship

---

[4] Mr. Fields did not "fail[] to disclose this related case in [his] notice to the Court." Motion at 18. He did not disclose *Randall* as related because it is not related for the reasons stated above.

14

as having a "fiduciary nature"), holding modified by *Tanner v. Hartog*, 618 So. 2d 177 (Fla. 1993); *Langbehn v. Pub. Health Tr. of Miami-Dade Cnty.*, 661 F. Supp. 2d 1326, 1346 (S.D. Fla. 2009) ("The Florida Supreme Court has recognized that there is a fiduciary relationship between a doctor and his patient, such that the doctor breaches his fiduciary duty if he discloses confidential information").[5]

Claims against healthcare providers do not have to involve breaches of confidentiality, as claimed by AdventHealth. Motion at 19. In *LeBlanc v. Acevedo*, the Court found a fiduciary duty between a patient and a doctor he saw for high blood pressure. 258 So. 3d 555, 556–57 (Fla. Dist. Ct. App. 2018). The court explained this common law fiduciary duty is distinct from the duty created by Florida statutes relating to the confidentiality of medical information, as discussed in AdventHealth's case, *Gracey v. Eaker* (cited *supra*). Breaches of confidentiality are merely one type of conduct that can amount to a breach—not the only type. *See, e.g., Langbehn*, 661 F. Supp. 2d at 1346 (an allegation supporting the breach claim was healthcare providers' failure "to provide medical treatment to [the patient] in accordance with her wishes"); *Nardone*, 333 So. 2d at 29 (alleged breach related to a doctor concealing harm done to patient).

The FAC pleads factual allegations showing Mr. Fields placed trust in AdventHealth to provide him with medical care divorced from race- and

---

[5] AdventHealth cites an inapplicable Nevada decision, *Valley Health System, LLC v. Murray*, 544 P.3d 904 (Nev. 2024), and represents that it "surveys cases nationwide" to conclude "no authority supports a broad finding that hospitals owe patients a fiduciary duty." Motion at 19–20. Nevada courts can certainly define the contours of such duties under Nevada law, this court is bound by conflicting Florida law on the issue, not considered by *Valley Health*.

stereotype-based medicine, and that AdventHealth breached that duty. Specifically, Plaintiff alleges:

- "As the transplant hospital[] for Mr. Fields, AdventHealth Orlando owed Mr. Fields a fiduciary duty. AdventHealth Orlando acted as an intermediary between Mr. Fields and the market for donor kidneys, similar to how a stockbroker operates for his clients' benefit in the financial markets. Mr. Fields, having no ability to communicate with UNOS or advocate for himself, trusted and relied on AdventHealth Orlando to act in his best interests in obtaining for him a life-saving kidney." FAC ¶ 85.

- "AdventHealth Orlando breached its fiduciary duty by engaging in racial discrimination against [Mr. Fields]. Specifically, AdventHealth Orlando breached its fiduciary duty by failing to inform Mr. Fields of their use of the race-based coefficient to adjust his eGFR score, and knowingly submitting eGFR scores tainted by use of the race-based coefficient to UNOS for inclusion in the UNet algorithm, prejudicing Mr. Fields's chances of receiving a donor kidney. Even after UNOS changed course and prohibited the use of the race-based coefficient, AdventHealth Orlando failed for more than a year to recalculate Mr. Fields's wait time." FAC ¶¶ 86–87.

- "The damages resulting from the above-described racial discrimination include but are not limited to depriving and/or delaying Mr. Fields's award of a donor kidney. This discrimination also caused Mr. Fields to incur economic injuries, including but not limited to, continued medical costs such as dialysis costs and lost wages stemming from an inability to resume work because of additional dialysis treatments and other resulting medical conditions caused by application of the race-based coefficient." FAC ¶¶ 88–89.

Like *Nardone*, Plaintiff further alleges that AdventHealth applied the race-based coefficient without transparency. *See id.* ¶ 16, n.2 ("Mr. Fields was never informed and was thus unaware that the race-based coefficient was applied to his eGFR score. Mr. Fields was further never informed and thus unaware that his accrual of wait time had been delayed by application of the race-based coefficient").

In sum, the FAC sufficiently alleges that as Mr. Fields's healthcare provider, AdventHealth, owed him a fiduciary duty and breached that duty by using an unscientific, race-based test, premised on the stereotype that Black people have big muscles to measure his kidney function, thus delaying his referral to the national kidney waitlist, without telling him.

**C.    Mr. Fields sufficiently alleges AdventHealth engaged in extreme and outrageous conduct**.

The Florida Supreme Court explains "outrageous" conduct, for purposes of IIED claims, as follows: "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Metro. Life Ins. Co. v. McCarson*, 467 So. 2d 277, 278–79 (Fla. 1985).

To test whether one would in fact exclaim "Outrageous!" once learning what AdventHealth is alleged to have done, we summarize in plain terms what happened. Mr. Fields desperately needed a life-saving kidney, and qualified to be added to the national kidney waitlist, if he were White. If Mr. Fields were White, AdventHealth would have added Mr. Fields to the waitlist, but because he is Black, they did not. AdventHealth knew that not referring Mr. Fields would make him wait years longer for a kidney, but they did so anyway, causing Mr. Fields to

17

undergo grueling dialysis treatments, that made him so sick he could not work, and ruined his life. Even after the racist practice employed by AdventHealth was banned, AdventHealth sat on its hands for nearly another year while Mr. Fields underwent dialysis treatments, before it got around to submitting a few pages of paperwork needed to adjust his wait time. Reasonable people should agree that denying Mr. Fields a kidney because he is Black is "outrageous!"

In addition to these outrageous facts, Florida law also counsels rejecting the Motion. *Allen v. Wal-Mart Stores, Inc.* is of note. 2010 WL 11623538 (M.D. Fla. July 13, 2010). There, the plaintiff attempted to cash $5,000 in money orders from Wal-Mart. *Id.* at *1. Wal-Mart thought they were counterfeits, and detained plaintiff until her arrest. *Id.* She sued for IIED. *Id.* Even with no opposition brief on file from the plaintiff, the court held that "dismissal of [IIED] at this stage of litigation would be premature, and therefore the motion to dismiss will be denied." *Id.* The Court denied the motion "in light of the extremely lenient 'notice pleading' standard," and because plaintiff's complaint sufficiently alleged Wal-Mart employees acted intentionally or recklessly, causing harm." *Id.* at *1–2.

*Allen*, and multiple other cases, support allowing this claim to proceed. Refusing to provide needed healthcare to Black people because they are Black is "utterly intolerable in civilized society." *Jones v. Baystate Health, Inc.*, 2022 WL 21778544, at *9 (D. Mass. Nov. 4, 2022) (alleged refusal to provide Black patient medical services stated claim for IIED, explaining "race discrimination in any context, including medical care, is 'utterly intolerable'"); *see also Craig v. Yale*

18

*Univ. School of Med.*, 838 F. Supp. 2d 4, 10–12 (D. Conn. 2011) (alleged discrimination against Black member of residency program stated claim for IIED).

None of AdventHealth's cases compel the Court to dismiss this claim. There is "no definitive example of what constitutes outrageous conduct." *Golden v. Complete Holdings, Inc.*, 818 F. Supp. 1495, 1499–1500 (M.D. Fla. 1993). Outrageousness is a legal question. *Vance v. Southern Bell Tel. Co.*, 983 F.2d 1573, 1575, n.7 (11th Cir. 1993). And though Florida imposes a "comparatively high standard" for what constitutes outrageousness (*Golden* at 1499), the Court should not determine, as a matter of law, that Mr. Fields's allegations are not outrageous enough, without the benefit of discovery.

## D.   **Plaintiff seeks permissible damages**.

AdventHealth argues that Mr. Fields's request for punitive and/or personal injury damages under Title VI must be dismissed. *See* Motion at 23–24. Mr. Fields does not disagree that such damages are unavailable as remedies under Title VI, but Mr. Fields made no prayer for such damages under Title VI. Rather, Mr. Fields's prayer for punitive damages relates to his IIED and breach of fiduciary duty claims, where such remedies are available after establishing the appropriate procedural and factual predicates for such damages. *Humana Health Ins. Co. of Fla. v. Chipps*, 802 So. 2d 492, 495 (Fla. Dist. Ct. App. 2001) (lower court denied remittitur for punitive damages award on IIED claim) (rev'd on other grounds); *Bailey v. St. Louis*, 196 So. 3d 375 (2016) (upholding punitive damages award on breach of fiduciary duty claim).

19

Finally, attorneys' fees are recoverable by prevailing parties in Title VI claims under the Civil Rights Attorney's Fees Award Act of 1976. *N. Carolina Dep't of Transp. v. Crest St. Cmty. Council, Inc.*, 479 U.S. 6, 12 (1986).

## **CONCLUSION**

For the foregoing reasons, the Court should deny the Motion to Dismiss.

Dated:  November 12, 2024                              Respectfully submitted,


                                                                            *s/Matthew L. Venezia*
                                                                            Matthew L. Venezia, *Pro Hac Vice*
                                                                            California Bar No. 313812
                                                                            George B. A. Laiolo, *Pro Hac Vice*
                                                                            California Bar No. 329850
                                                                            ELLIS GEORGE LLP
                                                                            2121 Avenue of the Stars, 30th Floor
                                                                            Los Angeles, California 90067
                                                                            Telephone: (310) 274-7100
                                                                            Email:  mvenezia@ellisgeorge.com
                                                                            Email:  glaiolo@ellisgeorge.com

                                                                            Natalia M. Salas
                                                                            Florida Bar No. 44895
                                                                            Angelica L. Novick
                                                                            Florida Bar No. 105069
                                                                            THE FERRARO LAW FIRM, P.A.
                                                                            Brickell World Plaza
                                                                            600 Brickell Avenue, Suite 3800
                                                                            Miami, FL 33131
                                                                            Telephone: (305) 375-0111
                                                                            Facsimile: (305) 379-6222
                                                                            Email: nsalas@ferrarolaw.com
                                                                            Email: anovick@ferrarolaw.com

                                                                            *Attorneys for Plaintiff Cortez Fields*

20

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 12, 2024, I electronically filed the foregoing document with the Clerk for the United States District Court, Middle District of Florida. The electronic case filing system (CM/ECF) will send a Norice of Electronic Filing (NEF) to the attorneys of record.

By: *s/Matthew L. Venezia*
Matthew L. Venezia