UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CORTEZ FIELDS,

        Plaintiff,

v.

UNITED NETWORK FOR ORGAN
SHARING and ADVENTIST
HEALTH SYSTEM/SUNBELT, INC.,
d/b/a AdventHealth Orlando,

        Defendants.

Case No. 6:24-CV-01434-JSS-DCI

**PLAINTIFF'S OPPOSITION TO DEFENDANT ADVENTHEALTH
ORLANDO'S MOTION FOR SUMMARY JUDGMENT**

3128299.1

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ................................................................................1

II.    STATEMENT OF FACTS .................................................................2

    A.    Nephrologists create the race-based coefficient, relying on the stereotype that Black people have bigger muscles. ................2

    B.    UNOS and AdventHealth require an eGFR score of 20 mL/min or less for registration and to accrue wait time on the kidney waitlist. ................................................................4

    C.    The race-based coefficient receives criticism for its use of race. ................................................................................4

    D.    Alternative race-neutral tests existed, and not every transplant center used the race-based coefficient. ....................5

    E.    AdventHealth uses the race-based coefficient to adjust Black patients' kidney function scores. .....................................6

    F.    Plaintiff is seen by an Advent nephrologist who fails to refer Plaintiff for a transplant evaluation or inform Plaintiff of the race-based adjustment. ....................................7

    G.    Plaintiff is not added to the waitlist for years and does not receive a transplant until 2023. ..........................................8

    H.    AdventHealth's discrimination causes Plaintiff serious emotional distress and economic damages. ..............................10

III.   ARGUMENT ....................................................................................10

    A.    Legal standard. ...............................................................10

    B.    A reasonable juror could find AdventHealth violated Title VI. ..................................................................................11

    C.    A reasonable jury could find Advent violated its fiduciary duty to Plaintiff. ..........................................................15

    D.    AdventHealth's actions caused Plaintiff harm. ..........................18

IV.   CONCLUSION ................................................................................20

CERTIFICATE OF SERVICE ................................................................21

## TABLE OF AUTHORITIES

**Page**

## CASES

*Abele v. Sawyer*,
747 So.2d 415 (Fla. App. 1999) ...................................................................18

*Alexander v. Sandoval*,
532 U.S. 275 (2001)......................................................................................13

*Belton v. Walmart, Inc.*,
No. 6:24-cv-1225-JSS-UAM, 2025 WL 1568160 (M.D. Fla. June 3,
2025) ............................................................................................................10

*Fisher v. University of Tex. at Austin*,
570 U.S. 297 (2013).....................................................................................14

*Gracey v. Eaker*,
837 So. 2d 348 (Fla. 2002) ..........................................................................15

*Gratz v. Bollinger*,
539 U.S. 244 (2003).................................................................................13, 14

*Hassan v. City of New York*,
804 F.3d. 277 (3d Cir. 2015) .......................................................................12

*Jones v. UPS Ground Freight*,
683 F.3d 1283 (11th Cir. 2012) ....................................................................10

*Langbehn v. Pub. Health Tr. of Miami-Dade Cnty.*,
661 F. Supp. 2d 1326 (S.D. Fla. 2009).........................................................16

*Massarsky v. Gen. Motors Corp.*,
706 F.2d 111 (3d Cir. 1983) (Slotiver, J., dissenting) ......................................12

*McCasland v. Pro Guard Coatings, Inc.*,
799 Fed. Appx. 731 (11th Cir. 2020).............................................................19

*Med. & Chiropractic Clinic, Inc. v. Oppenheim*,
981 F.3d 983 (11th Cir. 2020) ......................................................................15

*Miller v. Johnson*,
    515 U.S. 900 (1995)..................................................................................12

*Morrison v. Anyway Corp.*,
    323 F.3d 920 (11th Cir. 2003) ...............................................................10

*Nardone v. Reynolds*,
    333 So. 2d 25 (Fla. 1976) ......................................................................16

*Pate v. Threlkel*,
    661 So. 2d 278 (Fla. 1995) .....................................................................18

*Pers. Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979)................................................................................11

*Randall v. United Network for Organ Sharing*,
    720 F. Supp. 3d 864 (C.D. Cal. 2024) ..............................................18, 19

*Randall v. United Network for Organ Sharing*,
    Case No. 2:23-cv-2576-MEMF-MAA, ECF No. 244 (C.D. Cal. Feb.
    12, 2026) ................................................................................................16

*Regents of Univ. of Cal. v. Bakke*,
    438 U.S. 265 (1978)................................................................................13

*Santos v. United Network for Organ Sharing*,
    No. 1:24-cv-11692-IT, 2025 WL 2655148 (D. Mass. Sep. 15, 2025) ...............11

*Skop v. City of Atlanta*,
    485 F.3d 1130 (11th Cir. 2007) .............................................................10

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard
    College*,
    600 U.S. 181 (2023)........................................................................13, 14, 15

*Torres v. Sullivan*,
    903 So. 2d 1064 (Fla. App. 2005) .........................................................18

*Valley Health System, LLC v. Murray*,
    544 P.3d 904 (Nev. 2024)......................................................................18

*Villazon v. Prudential Health Care Plan, Inc.*,
    843 So.2d 842 (Fla. 2003) .....................................................................17

*Wittmer v. Peters*,
904 F. Supp. 845 (C.D. Ill. 1995), aff'd, 87 F.3d 916 (7th Cir. 1996)...............12

## **RULES**

Fed. R. Civ. P. 56(a)....................................................................................10

Fed. R. Evid. 602 ........................................................................................17

Fed. R. Evid. 803(6)......................................................................................9

## **OTHER AUTHORITIES**

Dept. of Justice, TITLE VI LEGAL MANUAL, Section VI...................................11, 13

https://journals.lww.com/jasn/fulltext/2026/03000/racial_and_ethnic_disp arities_in_outcomes.15.aspx.................................................................4

## I.    **INTRODUCTION**

For years, AdventHealth applied a race-based adjustment to its Black patients' kidney function scores. Arising out of the eugenics-style stereotype that Black people have bigger muscles, this adjustment was used only for Black people, making it harder for them to qualify for the kidney transplant waitlist. Estimating equations using the race-based coefficient may be cheaper, but they were never the only option. For example, less than 150 miles down the road, the Mayo Clinic directly measured GFR in a race-neutral manner.

One Black patient harmed by AdventHealth's discriminatory conduct was the Plaintiff, Mr. Cortez Fields. Mr. Fields was seen by an AdventHealth nephrologist in February 2019. At that time, if Mr. Fields were White, he would have qualified to be added to the kidney transplant waitlist. But solely because Mr. Fields is Black, AdventHealth adjusted his eGFR score upwards above the qualifying threshold to begin accruing wait time. Mr. Fields would not be added to the kidney waitlist by AdventHealth until years later.

Worse yet, AdventHealth failed to even inform Mr. Fields that his race was used to assess his kidney function score, or that under race neutral consideration, he qualified to join the kidney waitlist. This robbed Mr. Fields the opportunity to request AdventHealth treat him in a race neutral fashion, or if AdventHealth refused, for Mr. Fields to drive down the highway to the Mayo Clinic where he could have been added to the waitlist years earlier.

3128299.1                                              1

## II.     STATEMENT OF FACTS

### A.     Nephrologists create the race-based coefficient, relying on the stereotype that Black people have bigger muscles.

In 1999, Dr. Andrew Levey and his coauthors published the article creating the race-based coefficient, a 21% increase applied only to Black patients' eGFR (estimated glomerular filtration rate—kidney function) scores. Declaration of Matthew L. Venezia ("Venezia Decl.") ¶ 13, Ex. 12. The untested hypothesis proffered in support of this disparate treatment was racial stereotype: "black persons have greater muscle mass than white persons[.]" *Id.* at 4; Venezia Decl. ¶ 2, Ex. 1 (Greene Depo. at 18:3–17, 20:13–24, 27:2–16, 50:16–20); Venezia Decl. ¶ 3, Ex. 2 (Lewis Depo. 36:23–37:5). In 2009, Dr. Levey published an updated test known as the CKD-EPI. ECF No. 117-1 at 25. This test operated like the MDRD—artificially increasing only Black patients' eGFR scores (by 16% instead of 21%)—again relying on a perceived connection between race and muscle mass. *Id.*

AdventHealth's expert witnesses attempt to justify this disparate racial treatment as scientifically supported, but rebuttal expert testimony demonstrates otherwise. That the race-based coefficient discriminatorily treated Black patients worse without any scientific backing was readily apparent dating back to its creation in 1999. Venezia Decl. ¶ 22, Ex. 21 ("Lin Report") ¶¶ 47–50. Dr. Herbert Y. Lin, Harvard professor, editor of numerous medical journals, and practicing nephrologist at Massachusetts General Hospital for more than two decades, summarized:

> It is fair to say that I now have the benefit of hindsight; nonetheless, if I were the reviewer of this paper in 1999, I would have rejected the paper based on the sloppy justification for the use of a race-based coefficient. As noted above, I would have been highly troubled by the apparent implication of ugly, centuries-old stereotypes about Black people, with no serious science being offered in support of their hypothesis that Black persons have larger muscles.

*Id.* ¶ 56. Moreover, Dr. Sharp, Professor of genetics and genomic sciences at the Icahn School of Medicine at Mount Sinai, explained that the authors of the race-based coefficient failed to grapple with then-current understandings that race is neither biological nor a medically useful tool:

> In sum, it is my opinion that at the time of the creation of the MDRD equation (1999), established and considerable scientific research cast doubt on the usefulness of race as a biological variable. The MDRD paper failed to grapple with the then-current state of that research, and instead used race as a biological variable anyway, relying on problematic correlative data. A closer examination of the scientific prognosis on race should have lead the authors to avoid relying on it to predict kidney function.

Venezia Decl. ¶ 23, Ex. 22 ("Sharp Report") Ex. A § 3.d; *see also* Venezia Decl. ¶ 20, Ex. 19 (Williams Depo.) at 121:19–24 (AdventHealth's expert admits the CKD-EPI test AdventHealth used was based on a convenience, not representative, sample). In summary, AdventHealth's defense that the race-based coefficient was scientifically supported, even if it were legally relevant, fails on the merits.

**B.**     **UNOS and AdventHealth require an eGFR score of 20 mL/min or less for registration and to accrue wait time on the kidney waitlist.**

UNOS policy provides that kidney waitlist members do not begin to accrue wait time until their eGFR scores are 20 mL/min or less. Venezia Decl. ¶ 4, Ex. 3 (OPTN Policies 8.1–8.3).[1] Consistently, many transplant programs, including AdventHealth, do not register patients on the kidney waitlist until their eGFR scores reach the 20 mL/min threshold. ECF No. 117-2 at 80. As noted above, for Black patients, this score is artificially inflated, meaning Black patients' kidney function must decline to a greater extent than members of other races before they can accrue wait time towards a kidney transplant. Venezia Decl. ¶ 13, Ex. 12; ECF No. 117-1 at 25; Lin Report ¶ 72.

**C.**     **The race-based coefficient receives criticism for its use of race.**

While the large majority of transplant centers used the MDRD and CKD-EPI, use of the race-based coefficient included in those tests did not go without criticism:

- In November of 2011, Dr. Toni Martin published an article in the *American Journal of Kidney Diseases* that questioned use of the race-

---

[1] While wait time can also accrue once a patient is on dialysis, dialysis generally is not required until kidney function worsens to around 15 mL/min, making the 20 mL/min threshold the first opportunity to accrue wait time. Venezia Decl. ¶ 5, Ex. 4 (https://journals.lww.com/jasn/fulltext/2026/03000/racial_and_ethnic_disparities_in_outcomes.15.aspx, last Accessed March 6, 2026).

based coefficient and noting the history of purported genetic differences being used against Black Americans against a backdrop of "separate and unequal."

- In 2012, the College of American Pathologists described the MDRD's and CKD-EPI's use of race as a "drawback," in part because of "limited guidance on what to report for mixed-race populations or when to consider an individual as African American or not."

- The 2012 Kidney Disease Improving Global Outcomes (KDIGO) manual stated that "it is reasonable to use the CKD-EPI equation for GFR estimation" without "specific modifications for race" and acknowledged "[m]ore widespread testing of GFR estimating equations is necessary to resolve uncertainties about the need for racial . . . modifications."

- "Based on concerns regarding the race coefficient paired with inequities in access to kidney transplant, beginning in 2017, the Transplant Institute at Beth Israel Deaconess Medical Center (BIDMC) changed policy and utilized the eGFR without the Black race coefficient for all referred patients."

Venezia Decl. ¶ 6, Ex. 5 (KDIGO 2012 Guidelines at 43); Venezia Decl. ¶ 7, Ex. 6 (2011 Toni Martin Article ("The Color of Kidneys")); Venezia Decl. ¶ 8, Ex. 7 (2012 College of American Pathologist Survey) at CAP000147 (criticizing MDRD's use of race in methodology); Venezia Decl. ¶ 9, Ex. 8 (Beth Israel Research Article) at 1 (removing race-based coefficient improved transplant eligibility for Black patients).

## D. **Alternative race-neutral tests existed, and not every transplant center used the race-based coefficient.**

While the MDRD and CKD-EPI tests and their use of the race-based coefficient were common, they were neither the best available tests nor ubiquitous. *See, e.g.*, Venezia Decl. ¶ 18, Ex. 17 (Griffiths Depo.) at 38:03–13 (acknowledging

that the National Kidney Foundation advises that the "combined use of creatinine clearance test and cystatin C is the preferred method to assess a patient's eGFR."); Venezia Decl. ¶ 14, Ex. 13 ("Notably, Mayo Clinic and some other transplant centers have not relied on the eGFR number. Instead, Mayo Clinic has directly measured patients' glomerular filtration rates to determine kidney function."); Venezia Decl. ¶ 3, Ex. 2 (Lewis Depo. at 28:16–18; 63:20–22); Lin Report ¶¶ 95–98. GFR can be directly measured using iothalamate clearance, and this is considered the most accurate, "gold standard" measure of GFR. *Id.* At least one transplant center in Florida, the Mayo Clinic, never used the race-based coefficient and instead opted to directly measure GFR using iothalamate clearance. Venezia Decl. ¶ 14, Ex. 13; Lin Report ¶¶ 95–98. Moreover, beginning in 2017, major transplant programs like Beth Israel began moving away from the race-based coefficient because of concerns about its disparate treatment of Black patients. Venezia Decl. ¶ 9, Ex. 8.[2]

## E.    AdventHealth uses the race-based coefficient to adjust Black patients' kidney function scores.

It cannot be reasonably disputed that AdventHealth used the race-based coefficient. In November 3, 2021, records reflect that Ms. Zanel Spencer, Laboratory Manager for AdventHealth, submitted a "Change Needs Assessment"

---

[2] 24-hour urine tests measure GFR in a race-neutral manner and have been widely available since prior to the creation of either the MDRD or CKD-EPI tests. *Id.* ¶ 42. By 2012, Cystatin C offered another FDA-approved alternative for estimating GFR in a race-neutral manner that was found to be more accurate than the MDRD in a peer-reviewed article. *Id.* ¶ 44.

form requesting AdventHealth transition from the race-based CKD-EPI test to a new race neutral formula. Venezia Decl. ¶ 10, Ex. 9 (Spencer Depo.) at 13:2–25, 29:1–17 (admitting that AdventHealth transitioned from CKD-EPI to race neutral formula at this time); Venezia Decl. ¶ 11, Ex. 10 (Change Needs Assessment form). Ms. Spencer testified this change was implemented on July 24, 2022. Venezia Decl. ¶ 10, Ex. 9 (Spencer Depo.) at 29:5–7. AdventHealth admits this point in its Motion, defending the race-based coefficient as the standard of care. ECF No. 116 at 8–9 (describing the CKD-EPI, which uses the race-based coefficient, as the "national standard of care[,]" and later arguing, "AdventHealth faithfully followed the national standards of care"); 21 ("Once the OPTN changed its policies . . . to preclude the use of race-adjusted eGFR calculations . . . AdventHealth fully complied").

Plaintiff's medical records are consistent, indicating AdventHealth calculated his eGFR score using the race-based coefficient. In February 2019, when Plaintiff was admitted to AdventHealth and seen by a nephrologist, his medical records show his eGFR calculated as follows:

| Creatinine Lvl | 3.64 | HI | |
| GFR African Amer by CKD-E | 22 | | LOW |

Venezia Decl. ¶ 12, Ex. 11 at 50 of 260.

**F.    Plaintiff is seen by an Advent nephrologist who fails to refer Plaintiff for a transplant evaluation or inform Plaintiff of the race-based adjustment.**

On February 16, 2019, Plaintiff visited AdventHealth with chest pain and

"past medical history of CKD stage 4[.]" Venezia Decl. ¶ 12, Ex. 11 at 20 of 260. While it is true that Plaintiff first visited the emergency room, Plaintiff was admitted to AdventHealth to be evaluated by a nephrologist, consistent with his diagnosis of chronic kidney disease. *Id.* at 39 of 260. The AdventHealth nephrologist observed Plaintiff "presented with worsening ok kidney function[.]" *Id.* Specifically, Plaintiff's eGFR score was low enough to qualify him to join the kidney transplant waitlist absent the race adjustment. *See id.* at 50 of 260; Declaration of Cortez Fields ("Fields Decl.") ¶ 4, Ex. 1 (eGFR Kidney Waiting Time Modification Form showing that absent the race-based coefficient Plaintiff's eGFR score would have been 18 ml/min, below the 20 ml/min threshold required to accrue wait time); ECF No. 117-2 at 80 (AdventHealth's transplant selection criteria requiring eGFR of 20 ml/min or less). The AdventHealth nephrologist, nonetheless, recommended only that Plaintiff "monitor renal function" and "gentle hydration if creatine does not improve." Venezia Decl. ¶ 12, Ex. 11 at 39. AdventHealth never informed Plaintiff his kidney function score was modified because of his race, that he would have qualified to join the kidney transplant waitlist absent the use of the race-based coefficient, nor that Plaintiff should seek further evaluation in regard to a kidney transplant. Fields Decl. ¶ 5.

G.    **Plaintiff is not added to the waitlist for years and does not receive a transplant until 2023.**

If AdventHealth informed Plaintiff in February of 2019 that he qualified to join the kidney transplant waitlist absent application of the race-based coefficient,

he would have requested AdventHealth not adjust his eGFR score based on race. Fields Decl. ¶ 6. If AdventHealth refused, Plaintiff would have visited another hospital, like the Mayo Clinic, that did not use the race-based coefficient. *Id.* ¶ 7. Because AdventHealth failed to do so, Plaintiff did not know to investigate or raise the issue with the nephrologists he saw after his February 2019 visit. *Id.* ¶ 8.

AdventHealth cites medical advice purportedly given to Plaintiff many months later to argue that even when Plaintiff was advised to seek a transplant, he failed to timely do so. This does not contradict that Plaintiff would have sought race neutral treatment if he was informed that his race was used to disqualify him for referral to the kidney transplant waitlist, is not supported by admissible evidence[3], and is disputed. Plaintiff has no memory of being advised to apply for admission to transplant hospitals in November of 2019, and does not believe he received such advice, because he desired to be added to the kidney waitlist, and when he was told to seek admission to AdventHealth's transplant program in 2021, he promptly did so. Fields Decl. ¶ 9.

---

[3] Dr. Ibrahim has no memory of telling Plaintiff to apply for admission to a transplant hospital. Venezia Decl. ¶ 15, Ex. 14 (Ibrahim Depo.) at 41:03–15. Dr. Ibrahim did testify that his notes state, "[Fields] was also informed about transplant options and advised to make appointments with nearby transplant centers." *Id.* at 23:07–24:06. This, however, falls short of what is required to satisfy the business records exception to the hearsay rule. *See* Fed. R. Evid. 803(6) (requiring proof "the record was kept in the course of a regularly conducted activity" and "making the record was a regular practice of that activity[.]"

**H.    AdventHealth's discrimination causes Plaintiff serious emotional distress and economic damages.**

During the time period that Plaintiff's wait for a kidney was prolonged, he was unable to work, and he and his wife were forced to withdraw their life savings to support themselves. Fields Decl. ¶¶ 10, 11. Plaintiff also suffered tremendous emotional distress resulting both from his extended wait for a kidney, and the revelation that his race had been used to delay his for referral to the kidney transplant waitlist. Fields Decl. ¶ 12.

**III.    ARGUMENT**

**A.    Legal standard.**

"Summary judgment is appropriate if the 'movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Belton v. Walmart, Inc.*, No. 6:24-cv-1225-JSS-UAM, 2025 WL 1568160, at *1 (M.D. Fla. June 3, 2025) (citing Fed. R. Civ. P. 56(a)). "In determining whether a genuine dispute of material fact exists, the court must view the evidence and draw all factual inferences in the light most favorable to the non-moving party and resolve any reasonable doubts in that party's favor." *Belton*, 2025 WL 1568160, at *1 (citing *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007)). "If the record presents disputed issues of fact, the court cannot weigh the evidence or make findings of fact; rather, the court must deny the motion and proceed to trial." *Belton*, 2025 WL 1568160, at *1 (citing *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012); *Morrison v. Anyway Corp.*, 323

F.3d 920, 924 (11th Cir. 2003)).

### B.    A reasonable juror could find AdventHealth violated Title VI.

AdventHealth argues Plaintiff's Title VI claims fail for want of discriminatory intent. Motion, 19–21. AdventHealth argues, "If AdventHealth was motivated by a factor other than Plaintiff's race in his placement on the kidney transplant Waitlist-such as following national standards of care or prescribing clinically appropriate race-neutral conditions for a successful kidney transplant-there can be no intentional race discrimination." *Id.* at 20. This argument fails to grapple with Plaintiff's allegations and controlling law concerning racial classifications.

This Court rightly held in ruling on AdventHealth's motion to dismiss that "[t]he alleged use of the coefficient is not a facially race-neutral practice resulting in a disproportionate impact on Black patients; rather, it is a race-based practice." ECF No. 93 at 9 (citing *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979) ("A racial classification, regardless of purported motivation, is presumptively invalid . . . .")); *Santos v. United Network for Organ Sharing*, No. 1:24-cv-11692-IT, 2025 WL 2655148, at *6 (D. Mass. Sep. 15, 2025) ("application of the race-based eGFR adjustment . . . constitutes intentional discrimination within the meaning of Title VI"). Indeed, such classifications provide "the clearest form of direct evidence of discriminatory intent." Dept. of Justice, TITLE VI LEGAL MANUAL, Section VI: Proving Discrimination—Intentional Discrimination, Subheading B,

"Proving Intentional Discrimination" ("If a [defendant] explicitly . . . directs adverse action to be taken based on race, color, or national origin, such a policy or practice constitutes an express classification."). The DOJ further explains:

> **A recipient's express or admitted use of a classification based on race, color, or national origin establishes intent without regard to the decisionmakers' animus or ultimate objective.** Such classifications demonstrate a discriminatory purpose as a matter of law. *See Miller v. Johnson,* 515 U.S. 900, 904–05 (1995); *see also Wittmer v. Peters,* 904 F. Supp. 845, 849–50 (C.D. Ill. 1995), aff'd, 87 F.3d 916 (7th Cir. 1996). "Put another way, direct evidence of intent is 'supplied by the policy itself.'" *Hassan v. City of New York,* 804 F.3d. 277, 295 (3d Cir. 2015) (quoting *Massarsky v. Gen. Motors Corp.,* 706 F.2d 111, 128 (3d Cir. 1983) (Slotiver, J., dissenting)).

*Id.* (cleaned up) (emphasis added).[4]

Here, the evidence is undisputed that (1) the race-based coefficient is a racial classification—it is *embedded in the algorithm* that Black patients' eGFR scores are increased by 16%, and (2) AdventHealth had a policy and practice of using the race-based coefficient, including applying it to Plaintiff's kidney function scores. As to the first point, Dr. Bobby Nibhanupudy, Medical Director of AdventHealth's Abdominal Program, admitted during his deposition: "Q. And for the black adjustment, for black patients or African American patients, the score increases if they're black, correct? THE WITNESS: I believe that's correct." Venezia Decl. ¶ 24, Ex. 23 (Nibhanupudy Depo.) 7:11–19; 12:18–23 (objection omitted); ECF No. 117-

---

[4] AdventHealth's disparate impact argument fails to acknowledge the Court's order on motions to dismiss and these controlling authorities.

1 at 34–35 (providing CKD-EPI's differing equations for Black patients, "x . . . 1.159 if black").

On the second point, as admitted in the Motion, AdventHealth used the race-based coefficient until July 24, 2022, when Ms. Spencer's change request was accepted. Venezia Decl. ¶ 10, Ex. 9 (Spencer Depo.) at 13:2–25, 29:1–17; ¶ 11, Ex. 10. Consistently, medical records demonstrate that in February of 2019, AdventHealth used the race-based coefficient when measuring Plaintiff's kidney function score. Venezia Decl. ¶ 12, Ex. 11 at 50. Considering this evidence, a reasonable juror could find discriminatory intent.

AdventHealth says nothing on the topic, but this use of a racial classification triggers strict scrutiny, a point recognized in 50 years of binding Supreme Court precedent. *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 287–91 (1978) (holding racial classifications are subject to strict scrutiny under Title VI); *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181, 194–97 (2023) (same); *Gratz v. Bollinger*, 539 U.S. 244, 276 n. 23 (2003); *Alexander v. Sandoval*, 532 U.S. 275, 280–81 (2001). AdventHealth's use of the race-based coefficient fails this standard as a matter of law.

Under strict scrutiny, the Court first considers "whether the racial classification is used to 'further compelling governmental interests.'" *Students for Fair Admissions*, 600 U.S. at 206–07 (quoting *Grutter*, 539 U.S. at 326). The Court must "ask whether the government's use of race is 'narrowly tailored'—meaning 'necessary'—to achieve that interest." *Students for Fair Admissions*, 600

U.S. at 207 (quoting *Fisher v. University of Tex. at Austin*, 570 U.S. 297, 311–312 (2013)). This exacting analysis is required because "[r]acial classifications are simply too pernicious to permit any but the most exact connection between justification and classification." *Id.* at 217–18 (quoting *Gratz*, 539 U.S. at 270).

*Students for Fair Admissions* is instructive. In *Students for Fair Admissions*, the universities attempted to justify consideration of race in admissions by arguing, generally, that there is a need for diversity, and that diversity leads to more effective teaching of students. *Id.* at 214. The Supreme Court held that while these were "commendable goals[,]" they were not sufficient to justify racial classifications. *Id.* The Supreme Court also noted that the universities' admissions policies must fail because "race may never be used as a 'negative' and that it may not operate as a stereotype." *Id.* at 218 ("Harvard's 'policy of considering applicants' race . . . overall results in fewer Asian American and white students being admitted.").

AdventHealth engaged in discrimination of a far more invidious nature than seen in *Students for Fair Admissions*. Instead of being intended to remedy historical racism, the race-based coefficient operates to make it more difficult for a group victim to historical racism, Black persons, to receive donor kidneys. Moreover, the race-based coefficient is impermissibly based on the stereotype that Black people have bigger muscles. *See* Venezia Decl. ¶ 13, Ex. 12 at 4.

Were this not enough, the race-based coefficient fails just as resoundingly on the second step of the strict scrutiny analysis because AdventHealth cannot

14

establish use of the race-based coefficient was necessary. *Students for Fair Admissions*, 600 U.S. at 207. Evidence demonstrates transplant centers could simply use the popular MDRD or CKD-EPI tests without applying the race-based coefficient (like Beth Israel did in 2017), use direct measurement of GFR (like Mayo Clinic), or 24-hour urine tests. Venezia Decl. ¶¶ 9, 14, Exs. 8, 13; Venezia Decl. ¶ 3, Ex. 2 (Lewis Depo. at 28:16–18; 63:20–22); Lin Report ¶¶ 95–98.

To the extent AdventHealth points to its expert witness's defenses of the race-based coefficient to argue the practice could satisfy strict scrutiny, Plaintiff's rebuttal opinions squarely refute those arguments. *See generally* Lin Report; Sharp Report. Even if reasonable reliance on published articles could serve as a defense in the strict scrutiny analysis, a reasonable juror could find AdventHealth's use of the race-based coefficient, particularly by February 2019, to be patently unreasonable.

## C.     **A reasonable jury could find Advent violated its fiduciary duty to Plaintiff.**

"[T]o establish a breach of fiduciary duty under Florida law, a plaintiff must prove three elements: the existence of a fiduciary duty, a breach of that duty, and that the plaintiff's damages were proximately caused by the breach." *Med. & Chiropractic Clinic, Inc. v. Oppenheim*, 981 F.3d 983, 989 (11th Cir. 2020) (citing *Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002)). In the Motion, AdventHealth argues AdventHealth had no duty to Plaintiff. This is incorrect.

As the Court explained in denying AdventHealth's motion to dismiss

Plaintiff's breach of fiduciary duty claim, "Florida law recognizes that a healthcare provider, such as Adventist, owes a duty to its patient not to 'conceal[] facts known about harm done to the patient.'" ECF No. 93 at 12 (citing *Langbehn v. Pub. Health Tr. of Miami-Dade Cnty.*, 661 F. Supp. 2d 1326, 1347 (S.D. Fla. 2009); *Nardone v. Reynolds*, 333 So. 2d 25, 29 (Fla. 1976); *see also* Venezia Decl. ¶ 21, Ex. 20 [*Randall v. United Network for Organ Sharing*, Case No. 2:23-cv-2576-MEMF-MAA, ECF No. 244 at 26–34 (C.D. Cal. Feb. 12, 2026)] (denying motion for summary judgment on breach of fiduciary duty claims in case considering race-based coefficient). AdventHealth's motion fails to contend with this contradictory law.

Applied here, Plaintiff put his trust in doctors at AdventHealth to advise him regarding his kidney disease. Fields Decl. ¶ 2. AdventHealth failed to inform Plaintiff that it used the race-based coefficient to adjust his kidney function score until October 27, 2023, when required by UNOS. Fields Decl. ¶ 4, Ex. 1. Had AdventHealth informed Plaintiff, Plaintiff would have demanded race-neutral treatment, and if AdventHealth refused, he would have visited another hospital in Florida, like the Mayo Clinic, that did not use the race-based coefficient. Fields Decl. ¶¶ 6–7. AdventHealth's concealment of this material information concerning Plaintiff's medical treatment thus deprived him of the ability to seek race neutral treatment, and ultimately to apply for admission to the kidney waitlist in February 2019, when he first qualified to accrue wait time.

AdventHealth's remaining defenses fail. First, AdventHealth argues the nephrologists that treated Plaintiff at AdventHealth in February of 2019 were not

3128299.1

16

AdventHealth employees. There is, however, no such requirement to find AdventHealth vicariously liable for conduct of doctors practicing at its hospitals. *Villazon v. Prudential Health Care Plan, Inc.*, 843 So.2d 842, 855 (Fla. 2003) (finding genuine issue of material fact as to whether health care plan can be held vicariously liable for conduct of its member, independent contractor physicians).

Moreover, AdventHealth fails to present admissible evidence showing the nephrologists that treated Plaintiff were not employees. AdventHealth cites to deposition testimony from another of its doctors, Dr. Bobby Nibhanupudy, that Dr. Lazaro Luis Delgado and Dr. Raymond Saif were not AdventHealth employees, but instead "had privileges at AdventHealth." Def.'s Appx. at 392. Plaintiff was treated by Dr. Saif Rehman, not Dr. Raymond Saif. *See, e.g.*, Venezia Decl. ¶ 16, Ex. 15. There is no foundation for how Dr. Nibhanupudy knew Dr. Rehman's employment status with AdventHealth—indeed, Dr. Nibhanupudy did not even know his actual name. The testimony is thus inadmissible. Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). Moreover, Dr. Rehman is listed as an AdventHealth doctor on their website. Venezia Decl. ¶ 17, Ex. 16 ("Make an appointment with Saif Rehman, MD at AdventHealth now, find contact information and more. Your AdventHealth team is dedicated to providing whole-person care that heals your body, strengthens your mind and lifts your spirit."). A reasonable juror could find that a doctor that practices medicine at AdventHealth, and is listed on the AdventHealth website, does in fact provide

medical services on behalf of AdventHealth such as to make AdventHealth vicariously liable.

The remainder of AdventHealth's cases can be quickly dismissed. *Torres v. Sullivan*, 903 So. 2d 1064, 1067 (Fla. App. 2005), and *Pate v. Threlkel*, 661 So. 2d 278, 281 (Fla. 1995), are medical malpractice cases, not breach of fiduciary duty cases. AdventHealth's "intentional two-way relationship" cases concern differing factual scenarios, e.g., developer and transferee of property (*Abele v. Sawyer*, 747 So.2d 415 (Fla. App. 1999), where Florida directly considered a health care provider's duty to inform patients of harm, and reached the opposite conclusion.[5]

### D. AdventHealth's actions caused Plaintiff harm.

AdventHealth's argument it was not a but-for cause of harm to Plaintiff fails. Again, but-for AdventHealth's use of the race-based coefficient in February 2019, Plaintiff's eGFR score would have been below 20 mL/min, but because Plaintiff is Black, it was adjusted above. Fields Decl. ¶ 4, Ex. 1 (record showing racially-

---

[5] *Valley Health System, LLC v. Murray*, 544 P.3d 904, 909–10 (Nev. 2024) collected cases from other states, not Florida, finding no fiduciary relationship between a hospital and its patients *directly*. Here, there exists, at minimum, a fiduciary relationship between AdventHealth's agent physicians and Plaintiff. Nonetheless, the Court in *Randall* disagreed that under California law, there was no duty between the hospital and its patient in a case discussing failure to advise of use of the race-based coefficient. *Randall v. United Network for Organ Sharing*, 720 F. Supp. 3d 864, 885 (C.D. Cal. 2024) ("Randall has therefore adequately pleaded that the doctors he interacted with at Cedar-Sinai owed him a fiduciary duty, and that Cedars-Sinai may be held liable under a theory of respondeat superior for a breach of that duty by failing to inform him of the facts and by taking advantage of his trust by prioritizing other patients over him.").

adjusted score above 20, but below 20 without the racial adjustment). An eGFR score below 20 mL/min is a *necessary condition* for admission onto the waitlist at AHO. *See* ECF No. 117-2 (MSJ Appendix Part 2) at 80 (requiring eGFR less than or equal to 20 for waitlisting). Because Plaintiff did not meet this necessary condition (though, if he had not been Black, he would have), by AdventHealth's own policy, AdventHealth could not place Plaintiff on the waitlist. Nor did AdventHealth inform Plaintiff that it adjusted his eGFR score because of his race such that Plaintiff could request race neutral treatment, either at AdventHealth, or another hospital like the Mayo Clinic. Fields Decl. ¶¶ 6–8. *See* Venezia Decl. ¶ 21, Ex. 20 at 33 (*Randall* motion for summary judgment order finding causation where plaintiff whose score was adjusted using race-based coefficient "would have pursued different treatment had he been fully informed").

Nor does this determination require expert testimony. AdventHealth points to cases concerning complicated medical diagnoses, like *McCasland v. Pro Guard Coatings, Inc.*, 799 Fed. Appx. 731, 734 (11th Cir. 2020), where evidence failed to show Liquid Roof, a roofing product, causes oromandibular dystonia. It takes no such sophisticated medical knowledge to find the race-based adjustment caused Plaintiff's eGFR score to exceed 20 mL/min, only simple arithmetic. Nor is any scientific expertise required to determine that a score above 20 mL/min does not qualify for addition to the waitlist under AdventHealth's policy. Lastly, this is not a "for-want-of-nail" argument. This case does not concern attenuated, downstream impacts, but instead the direct consequences of AdventHealth's discriminatory

3128299.1                                   19

policy on Plaintiff's ability to join the kidney waitlist.

## IV.    <u>CONCLUSION</u>

For the reasons set forth above, the Motion should be denied.

Dated: March 30, 2026

Respectfully submitted,

*s/George B. A. Laiolo*
George B. A. Laiolo, *pro hac vice*
California Bar No. 329850
Matthew L. Venezia, *pro hac vice*
California Bar No. 313812
Elizabeth Carpenter, *pro hac vice*
California Bar No. 315674
Daniel A. Contreras, *pro hac vice*
California Bar No. 329632
ELLIS GEORGE LLP
2121 Avenue of the Stars, 30th Floor
Los Angeles, California 90067
Telephone: (310) 274-7100
Email:  glaiolo@ellisgeorge.com
Email:  mvenezia@ellisgeorge.com
Email:  ecarpenter@ellisgeorge.com
Email:  dcontreras@ellisgeorge.com

Natalia M. Salas
Florida Bar No. 44895
Angelica L. Novick
Florida Bar No. 105069
THE FERRARO LAW FIRM, P.A.
Brickell World Plaza
600 Brickell Avenue, Suite 3800
Miami, FL 33131
Telephone: (305) 375-0111
Facsimile: (305) 379-6222
Email: nsalas@ferrarolaw.com
Email: anovick@ferrarolaw.com

*Attorneys for Plaintiff Cortez Fields*

3128299.1

20

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF (NEF) and paper copies will be sent to those indicated as non-registered participants on March 30, 2026.

*s/George Laiolo*
George B. A. Laiolo

3128299.1

21